**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 13-cv-2896-CMA-MJW

SEAN McALLISTER,

      Plaintiff,

v.

DETECTIVE MICHAEL KELLOGG, in his individual and official capacities;
POLICE OFFICER MICHAEL REIFSTECK, in his individual and official capacities;
POLICE OFFICER ROBERT CASH, in his individual and official capacities; and
THE CITY AND COUNTY OF DENVER, a municipality,

      Defendants.

---

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

---

      This matter is before the Court on Defendants' Motion to Dismiss the Second Amended Complaint (Doc. #36).  For the reasons provided below, the instant Motion is granted in part and denied in part.

## I.  <u>BACKGROUND</u>

      Plaintiff Sean McAllister was arrested and jailed on October 12, 2011, on suspicion of committing domestic violence against his then-wife, Hilary McAllister.  (Doc. # 33, ¶ 18.)  Two days later, after holding a hearing, Summit County Judge Edward Casias issued a Mandatory Protection Order ("MPO"), directing Mr. McAllister to "stay away from" Ms. McAllister's home and "any other location [she] is likely to be found."

(*Id.*)  The couple had a shared home in Breckenridge, where their children lived and where they would alternate parenting time, and also leased two separate apartments in Denver.  (*Id.* ¶¶ 12, 13.)  Mr. McAllister's Denver apartment was located at 1055 Sherman Street, and his was the only name that appeared on the apartment's lease. (*Id.* ¶ 14.)  Hilary McAllister's Denver apartment was located at 1250 Sherman Street. (*Id.* ¶ 16.)  During the course of the MPO hearing, Judge Casias concluded that "[i]n regards to the children I do not find you're a risk to them . . . So I'm not going to deny you access to your children."   (*Id.* ¶ 19.)  Accordingly, the MPO listed only Ms. McAllister as a protected party.  (*Id.;* Doc. # 36-1.)  It did, however, provide that Mr. McAllister "[m]ay not remove children from state of Colo[rado] without Court permission. No contact except may have contact through 3rd party to schedule visitation w/children." (Doc. # 36-1.)

On October 14, 2011, upon being released from jail in Breckenridge, Mr. McAllister drove to his apartment in Denver, at 1055 Sherman Street, where he encountered the couple's two-year old son, Elijah, as well as his seventeen-year-old stepdaughter, Madison Welch.  (Doc. # 33 ¶ 24.)  Mr. McAllister left the apartment after about twenty minutes.  (Doc. # 36-3.)  That same day, Ms. McAllister called the Denver Police and reported that Plaintiff had violated the MPO; in response, Defendant-Detective Michael Reifsteck and Defendant-Officer Robert Cash arrived at 1055 Sherman Street, where Ms. McAllister let them in and spoke to them about Mr. McAllister's presence at the 1055 Sherman Street apartment.  (*Id.* ¶¶ 25-27.)  Detective Reifsteck's "Officer Statement," dated October 14, 2011, indicates that he (apparently)

2

misunderstood, or was given incorrect information about, where Mr. McAllister lived,

stating that "Their main residence is in Breckinridge [sic] CO and they have a shared

apartment at 1055 N. Sherman St. . . . . A second Apartment was leased in Denver at

1250 N. Sherman St. . . . Sean started staying at the second apartment when their

relationship started going bad."  (*Id.* ¶¶  29-30; Doc. # 36-3.)  In his report, Detective

Reifsteck also stated that:

> On [October 14, 2011], the victim came to Denver to attend school.  She
> believed at this time that Sean was still in jail in Summit County.  **She
> dropped off her 17 year old daughter . . . and her 2 year old son . . . at
> 1055 N. Sherman St. . . . while she attended class.  She stated that if
> she knew Sean was out of jail, she would not have left [their son]
> there**.  Between the listed times, [her daughter] contacted her and related
> that Sean was at the apartment.  [Her daughter] related to her mother over
> the phone that she believed he intended to take [their son.]  [Mr.
> McAllister] did not take [their son] and left after approximately 20 minutes.
>
> **After speaking with the victim she was very adamant about pursuing
> charges against Sean for violating the restraining order**. She did not
> have a copy of the restraining order. **I looked up the restraining order
> on my MDT and it states he may have visitation with the children**.  . . .
>
> **Hilary related to me that her kids are definitely included in the
> restraining order**.  I spoke with Wendy Vanantwerp . . . from Summit
> County Social Services and she is also under the assumption that the kids
> are included in the restraining order.

(Doc. # 36-3)(emphasis added).  In his "Narrative Text Report," dated October

14, 2011, Officer Cash apparently had a different understanding of the

McAllister's living situation, stating that:

> [Ms. McAllister] stated that she had received a phone call from her
> daughter concerning an incident she had at 1055 N Sherman St . . . She
> stated that her daughter was at the apartment with another one of her
> minor children when her ex-husband (Sean McAllister) arrived on the
> scene.  He had just gotten out of jail for a [domestic violence] case related

to the victim.  She was under the understanding that he would not be allowed out without her knowledge.  When he arrived at the apartment the JV daughter fled with the victim[']s other minor child.  He then left the scene. **That apartment is his primary residence.  The victim has a different apartment she lives at.  These parties share three residence[s]** . . . It was unknown if a RO violation actually occurred at this point.

(Doc. # 36-4) (emphasis added).  Neither Detective Reifsteck nor Officer Cash took additional steps to verify which apartment was Mr. McAllister's primary residence (for instance, neither looked up the apartment's lease information). (Doc. # 33 ¶¶ 32, 35.)

On October 16, 2011, Defendant-Officer Michael Kellogg began investigating Ms. McAllister's reported violation of the MPO.  (*Id.* ¶ 38.)  Officer Kellogg obtained the MPO involving Mr. McAllister, and in a report, stated that "the PO issued out of Summit County . . . shows issue date of 10/14/11 (same date as alleged violation) . . . The victim is the only protected party listed with other instructions about the children and visitation." (Doc. ## 33 ¶¶ 41-42; 36-5 at 3).

On October 18, 2011, the Summit County District Attorney filed a motion to amend the MPO to add Mr. McAllister's biological children and his stepdaughter, Ms. Welch, as protected parties. Judge Casias granted the amendment to the MPO as to Ms. Welch that same day, but denied the amendment as to Mr. McAllister's biological children.  (*Id.* ¶ 45.)  As such, the MPO only became effective as to Mr. McAllister's stepdaughter on October 18, 2011.

On October 23, 2011, Officer Kellogg interviewed Ms. McAllister and her stepdaughter about the alleged violation of the MPO.  (*Id.* ¶ 46.)  His written report summarizing this meeting reads as follows:

> [Ms. McAllister] [g]oes to school at Colorado Institute of Art which is 1 block west of 1250 N. Sherman St. . . She comes to Denver for school. **She let [her children] stay at 1055 [Sherman] because she had taken most of her personal items out of 1250 Sherman because her lease was up midnight on 10/23/11**.  Sean's apt has cable and living room furniture [and] that is why she let [her stepdaughter and son] stay over at Sean's apt while she was at school.  **Her primary residence along with her children is in Breckenridge.  When she comes to Denver she would stay at 1250 Sherman. Sean has a second apartment located at 1055 N. Sherman** . . . On the date of the incident she believed Sean was still up in Summit County in Jail because she was told that she would have been called when Sean bonded out.

(Doc. # 36-5 at 4) (emphasis added).  Officer Kellogg also stated that Ms. McAllister gave him a copy of the MPO – presumably, the **amended** MPO – because he noted that the document showed "Madison as protected party. Hilary's other children . . . . are not on  the MPO." (*Id.*)

On October 24, 2011, Defendant Kellogg sought and obtained an Arrest Warrant for Mr. McAllister.  (*Id.* ¶ 51.)  In doing so, he completed an "Affidavit and Application for Arrest Warrant" ("the Warrant Affidavit.")   The Warrant Affidavit included the following statements:

> On October 14, 2011, at approximately 1:30 PM, Denver Police Officers Michael Reifsteck and Robert Cash were dispatched to 1055 N. Sherman Street . . . on a Restraining Order Violation. . . . Officers contact the complainant, Hillary McAllister . . . Officers learn the following from her:
>
> Hilary and her soon to be ex/husband/suspect of 7 years, Sean McAllister . . . a week prior were involved in a domestic violence incident out of Breckenridge Colorado . . . A mandatory protection order was issued

under this OCA number. **Hilary believed she and her children . . . were all listed as protected parties on this order**. . . .

On 10/14/11 at approximately 1:00 p.m. she was called by [her daughter] who was with [her son] at 1055 N. Sherman St. [Her daughter] tells Hilary that Sean is at the apartment and believes Sean was going to take [her son] from the apartment. Hilary learns from [her daughter] that Sean was at the apartment for about 20 minutes then he left.

Officer Reifsteck observes on his Mobile Data Terminal a protection order was issued . . . listing only Hilary McAllister as a protected party. Officer Reifsteck observes he order to read in part: No contact except may have visitation with children/contact in court ordered mediation or court hearings.

On October 16, 2011, affiant was assigned this case file for follow-up investigation. Affiant completed Colorado State Court computer check which shows Sean McAllister was detained in Denver jail on 10/12/11. On **10/14/11 Sean was in Summit County Jail, given his first advisement with a Mandatory Protection Order issued showing only Hilary on the order. . . . The following is cut and pasted from the Court notes: No Contact Except May Have Visitation w/Children** . . . shall vacate the home of the victim(s) and stay away from any other location the victim(s) is/are likely to be found . . .

On October 23, 2011, at approximately 12:10 p.m. affiant met with Hillary McAllister . . . **Hilary had a copy of the protection order issued out of Summit county. Order shows [Mr. McAllister's stepdaughter] as an additional protected party**.

Order reads in part: Shall vacate the home of the victim(s), stay away from the home of the victim(s), and stay away from any other location the victim(s) is/are likely to be found.

(Doc. # 36-2) (emphasis added). Notably, Officer Kellogg did not include the date of the version of the MPO on which he was relying for the notion that Mr. McAllister's stepdaughter was listed "as an additional protected party" – that is, the date of the amended MPO. The amended MPO was not in effect until after October 18, 2011, **after** the incident for which Mr. McAllister was being arrested (i.e., his visit to 1055 Sherman

on October 14th).  (*Id.* ¶ 50).  Officer Kellogg also failed to include information about how 1055 Sherman Street was Mr. McAllister's own residence.  (*Id.*)

On October 26, 2011, Mr. McAllister was arrested in Denver pursuant to this arrest warrant, for an alleged protection order violation.  (*Id.* ¶ 52.)  After spending approximately four to five hours in the Denver jail, Mr. McAllister was released.  (*Id.* ¶ 53.)  The Denver protection order violation case was subsequently dismissed.  (*Id.*)

Mr. McAllister brought a Complaint against Defendants Kellogg, Reifsteck and Cash in both their individual and official capacities, as well as against the City and County of Denver ("Denver"), alleging two violations of 42 U.S.C. § 1983 ("Section 1983").  His first claim for relief alleges that Defendants Kellogg, Reifsteck and Cash "detained and falsely arrested Mr. McAllister for making inadvertent contact with his step-daughter" without probable cause.  (*Id.* ¶¶ 59-64.)  His second claim for relief alleges that Defendants' actions were pursuant to Denver's "long-standing, department-wide customs, policies and/or actual practices" of "not reading or checking the actual contents of court orders such as arrest warrants or protection orders before arresting individuals who are neither wanted nor in violation of protection orders."  (*Id.* ¶¶ 67-69.) Additionally, Mr. McAllister alleges that Denver should be held liable for its failure to properly train, supervise, and discipline its law enforcement officials as to their violations of the public's right "to be free from constitutional violations, specifically Fourth violations and arrests made without probable cause," and that Plaintiff's injuries were a "a direct and proximate cause and consequence of Defendant Denver's failure to train and supervise."  (*Id.* ¶¶  70-75.)

## II.  <u>ANALYSIS</u>

### A. Legal Standard

Rule 12(b)(6) provides that a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  *See* Fed. R. Civ. P. 12(b)(6).  In deciding a motion under Rule 12(b)(6), the Court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (*quoting Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)).

"The pleading standard Rule 8 announces does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.  A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.  Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."  *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting and citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and citations omitted; alterations incorporated)).  As the Tenth Circuit explained in *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007), "the mere metaphysical possibility that **some** plaintiff could prove **some** set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that **this** plaintiff has a reasonable likelihood of mustering factual support for **these** claims."

Further, "only a complaint that states a plausible claim for relief survives a motion to dismiss.  Determining whether a complaint states a plausible claim for relief will  . . .

be a context-specific task that requires the reviewing court to draw on its judicial

experience and common sense.  But where the well-pleaded facts do not permit the

court to infer more than the mere possibility of misconduct, the complaint has alleged –

but it has not shown – that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679

(internal citations and quotation marks omitted; alterations incorporated).  Thus, the

burden is on the Plaintiffs to "nudge [their] claims across the line from conceivable to

plausible." *Twombly*, 550 U.S. at 570.

Generally, a court considers only the contents of the complaint when ruling on a

Rule 12(b)(6) motion. *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010).  A Court

may consider materials in addition to the pleadings in certain limited circumstances,

however.  For example, if a plaintiff does not incorporate by reference or attach a

document to his or her Complaint, a defendant may submit an undisputably authentic

copy which may be considered in ruling on a motion to dismiss. *GFF Corp. v.

Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997) (noting that

"When a complaint refers to a document and the document is central to the plaintiff's

claim, the plaintiff is obviously on notice of the document's contents"); *see also Utah

Gospel Mission v. Salt Lake City Corp.*, 425 F.3d 1249, 1253–54 (10th Cir. 2005) (a

document which is "central to the plaintiff's claim and referred to in the complaint may

be considered in resolving a motion to dismiss, at least where the document's

authenticity is not in dispute.")  Here, Defendants submitted three documents as exhibits

in support of their motion to dismiss: (1) the Mandatory Protection order, dated October

14, 2011; (2) the "Officer Statement," prepared by Detective Reifsteck, dated October

14, 2011; (3) a "Narrative Text Report," Prepared by Officer Cash, dated October 14, 2011; (4) A "Supplementary Report," prepared by Officer Kellogg, dated October 16, 2011; and (5) the Affidavit and Application for Arrest Warrant, prepared by Officer Kellogg, dated October 24, 2011.  (Doc. ## 36-1 to -5.)  Plaintiff did not dispute the authenticity of these documents in his Response to Defendants' Motion to Dismiss, and all of these documents are referred to in his Complaint and central to his claims. Accordingly, the Court considered them in deciding the Motion to dismiss.

## B. Plaintiff's False Arrest Claim

Defendants argue that they are entitled to dismissal on grounds of qualified immunity because Mr. McAllister was arrested pursuant to a facially valid arrest warrant.

When a defendant raises qualified immunity as a defense, "a plaintiff must properly allege a deprivation of a constitutional right and must further show that the constitutional right was clearly established at the time of the violation." *Kaufman v. Higgs*, 697 F.3d 1297, 1300 (10th Cir. 2012). The Court is not required to address these inquiries in any specific order, *Pearson v. Callahan*, 555 U.S. 223, 236-37 (2009), and if a plaintiff fails to carry either part of his or her two-part burden, the defendant is entitled to qualified immunity, *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001).

Officers must have probable cause to arrest an individual under the Fourth Amendment.  Probable cause is not a precise quantum of evidence – it does not, for example, require the suspect's guilt to be more likely true than false.  "Instead, the relevant question is whether a 'substantial probability' existed that the suspect

10

committed the crime, requiring something 'more than a bare suspicion.'" *Kerns v. Bader*, 663 F.3d 1173, 1188 (10th Cir. 2011) (citations omitted).  In the context of a qualified immunity defense on an unlawful arrest claim, the Court determines whether a particular defendant violated clearly established law "by asking whether there was 'arguable probable cause'" for the challenged conduct.  *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014).  "Arguable probable cause" is another way of saying that the officers' conclusions about whether probable cause existed rested on an objectively reasonable – even if mistaken – belief.  *Cortez v. McCauley*, 478 F.3d 1108, 1120 (10th Cir. 2007).  A defendant "is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed to arrest or detain the plaintiff."  *Id.*

A neutral magistrate judge's issuance of a warrant is "the clearest indication that the officers acted in an objectively reasonable manner or . . . in 'objective good faith.'" *Messerschmidt v. Millender,* 132 S. Ct. 1235, 1245 (2012) (quoting *United States v. Leon*, 468 U.S. 897, 922–23 (1984)).  Nonetheless, "the fact that a neutral magistrate has issued a warrant authorizing the allegedly unconstitutional search or seizure does not end the inquiry into objective reasonableness."  *Id.*  The "shield of immunity" otherwise conferred by the warrant is lost under two circumstances.  *Id.*

First, if "it is obvious that no reasonably competent officer would have concluded that a warrant should issue," the warrant offers no protection.  *Id.* In other words, qualified immunity will not be granted "where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."  *Id.* (internal quotation marks omitted).  Second, a warrant will not

protect officers who misrepresent or omit material facts to the magistrate judge. *Stonecipher*, 759 F.3d at 1142.  The burden is on the plaintiff to "make a substantial showing of deliberate falsehood or reckless disregard for truth" by the officer seeking the warrant.  *Id.* (quoting *Snell v. Tunnell*, 920 F.2d 673, 698 (10th Cir. 1990)).  This test is an objective one, and when there is no dispute over the material facts, a court may determine as a matter of law whether a reasonable officer would have found probable cause under the circumstances.  *Cortez*, 478 F.3d at 1120–21 ("The conduct was either objectively reasonable under existing law or it was not.").

In determining whether a plaintiff has established reckless disregard for the truth on behalf of an officer presenting facts to the magistrate judge, evidence must exist that the "officer in fact entertained serious doubts as to the truth of his allegations . . . and [a] factfinder may infer reckless disregard from circumstances evincing obvious reasons to doubt the veracity of the allegations."  *Stonecipher*, 759 F.3d at 1142 (quoting *Beard v. City of Northglenn*, 24 F.3d 110, 116 (10th Cir. 1994)).  Reckless disregard of the truth may be also inferred from the omission of facts which are "clearly critical" to a finding of probable cause.  *Bruning v. Pixler*, 949 F.2d 352, 357 (10th Cir. 1991).  However, "the failure to investigate a matter fully, to exhaust every possible lead, interview all potential witnesses, and accumulate overwhelming corroborative evidence rarely suggests a knowing or reckless disregard for the truth.  To the contrary, it is generally considered to be token negligence at most."  *Beard*, 24 F.3d at 116 (internal quotation marks and citations omitted) (emphasis added).  Additionally, not all errors and omissions in an affidavit will negate probable cause, and not all evidence known to an officer need be

included in an affidavit.  *DeLoach v. Bevers*, 922 F.2d 618, 622-23 (10th Cir. 1990).

Instead, the Court must ask both whether the truthful statements included in the affidavit

are by themselves sufficient to support a probable cause finding, **and** if inclusion of the

omitted material would negate probable cause.  *Id.*

Because three separate officers have been charged as Defendants in this matter,

the Court examines their qualified immunity claims separately, beginning with Detective

Reifsteck and Officer Cash.  Plaintiff alleges the same theory of liability against

Reifsteck and Cash: namely, that after interviewing Ms. McAllister, both completed

written reports in which they wrongfully reported – because Ms. McAllister falsely told

them – that Mr. McAllister shared the apartment at 1055 Sherman St. with Ms.

McAllister (such that she was "likely to be found" at that apartment and thus he violatd

the MPO).  (Doc. # 33 at ¶¶ 25-28, 30-31.)  Plaintiff also alleges that the Officers both

failed to verify the statements about which apartment actually belonged to Mr.

McAllister, and that if they had done so, they would have discovered that Mr.

McAllister's name was the only name on the lease and therefore that he had a right to

be in the apartment.  (*Id.* at ¶¶ 32, 35.)   Plaintiff further alleges that the reports

Reifsteck and Cash generated "ultimately led to [Mr. McAllister's] arrest" because

Detective Kellogg reviewed them in preparing the arrest warrant affidavit, and that

Reisteck and Cash "knew and intended" that Kellogg would rely on their reports in

seeking this arrest warrant.   (*Id.* at ¶¶ 36-39.)

The connection between Detective Reifsteck's and Officer Cash's actions and

Mr. McAllister's arrest, however, is simply too tenuous for him to state a claim based on

their conduct.  These Officers were not, of course, actually preparing an arrest warrant;

rather, they were merely providing the "first line" of investigation.  In any case, although

they did not follow up to determine whether Ms. McAllister was telling the truth about the

couple's living arrangements, Ms. McAllister answered the door at 1055 Sherman St.,

there were no signs of forced entry,[1] and she was still married to Mr. McAllister –

accordingly, they had no indication whatsoever that she was lying.   As such, the fact

that the Officers did not fully investigate to exhaust every possible lead, interview all

potential witnesses, and otherwise accumulate overwhelming corroborative evidence

indicating that Ms. McAllister lived at 1055 Sherman Street constituted "token

negligence" – at most.  *See Beard*, 24 F.3d at 116.

        In fact, both Officers' reports clearly indicate that they understood that the real

issue was not whether Mr. McAllister had a right to be in the apartment, but whether the

children were listed as protected parties under the MPO.  Both indicated that they were

unsure, and thus, that they were also unsure about whether an MPO violation had in

fact, occurred, despite Ms. McAllister's representations to the contrary.  Specifically,

Detective Reifsteck followed up with social services in attempting to confirm whether the

children were protected parties, and noted that although Ms. McAllister "was very

adamant about pursuing charges against Sean for violating the restraining order," after

he looked up the MPO, it stated that Mr. McAllister "may have visitation with the

---

[1] Plaintiff alleges that Mr. McAllister did not know that Ms. McAllister would be in the apartment and that she obtained an apartment key from the apartment building's management company by misrepresenting herself as a member of Mr. McAllister's family.  (Doc. # 33, ¶ 44.) However, Detective Reifsteck and Officer Cash did not have a reason to know that this fact.

children." (Doc. # 36-3).   Similarly, Officer Cash noted that "It was unknown if a RO violation actually occurred at this point."  (Doc. # 36-4.)   Moreover, Plaintiff provides **no** evidence which even suggests that the Officers included the false statements, or omitted any facts, knowingly or with reckless disregard for the truth, rather than out of negligence or inadvertence.  In sum, Detective Reifsteck and Officer Cash are entitled to qualified immunity for their preliminary investigative activities.

Defendant Kellogg, however, is not entitled to immunity, because he omitted facts which would have negated probable cause for Mr. McAllister's arrest – specifically, he omitted the effective date of amended MPO listing Mr. McAllister's stepdaughter as a protected party.  *See DeLoach*, 922 F.2d at 622-23.

On October 23, 2011, Officer Kellogg interviewed Ms. McAllister, and she told him that she let her children stay over at "Sean's apt" (i.e., 1050 Sherman St.), while she was at school, because his apartment had cable and living room furniture, and she had removed these items from her own apartment (at 1250 Sherman St.) because her lease was about to expire.  (Doc. # 36-5 at 4.)   In light of this information, it was no longer reasonable for Officer Kellogg to believe that Mr. McAllister had violated the MPO by visiting a place where **Ms. McAllister** was "likely to be found," because at that point, Officer Kellogg knew that Ms. McAllister had left her children at Mr. McAllister's **own apartment**.  Rather, the only possible grounds for an alleged violation of the MPO was that the **children** would be likely to be found in the apartment.  However, it is clear that Officer Kellogg knew – as of October 16, 2011, because he said so in writing – that the original MPO, effective on the date of the purported violation, did not list the children

15

as protected parties.   (Doc. # 36-5 at 3) ("the PO issued out of Summit County . . .

shows issue date of 10/14/11 (same date as alleged violation) . . . The victim is the only

protected party listed with other instructions about the children and visitation.")  Officer

Kellogg's Warrant Affidavit, however, read (in relevant part) as follows:

> A mandatory protection order was issued under this OCA number.  Hilary
> believed she and her children . . . were all listed as protected parties on this
> order. . . . On 10/14/11 Sean was in Summit County Jail, given his first
> advisement with a Mandatory Protection Order issued showing only Hilary on the
> order. . . .
>
> On October 23, 2011, at approximately 12:10 p.m. affiant met with Hillary
> McAllister . . . **Hilary had a copy of the protection order issued out of
> Summit county.  Order shows [Mr. McAllister's stepdaughter] as an
> additional protected party.**

(Doc. # 36-2.)  As such, the Affidavit omits a crucial detail: namely, the effective date of

the **amended** MPO listing Mr. McAllister's stepdaughter as a protected party – October

18, 2011 – four days **after** the alleged violation for which Mr. McAllister was being

arrested.   (Doc. # 36-2.)

Officer Kellogg's failure to distinguish between the two MPOs in any fashion

would imply to a Magistrate Judge reviewing the Affidavit and making a probable cause

determination that the "copy of **the** protection order issued out of Summit county," which

he stated listed Mr. McAllister's stepdaughter, was the same document as the MPO

dated October 14, 2011.  It was, however, not the same document.  The Magistrate

Judge's misunderstanding would only be compounded by the fact that the Warrant

Affidavit quotes the other officers' reports in stating that the MPO did not cover the

children, and then states that from his own interview with Ms. McAllister, he determined

the order showed that the children were covered.  As such, that the MPO in effect on the day of the alleged violation did not list Mr. McAllister's stepdaughter as a protected party, and, in fact, explicitly granted contact with his children, is an omitted fact which was "clearly critical" to a finding of probable cause that he violated the MPO as to his stepdaughter.  *See Bruning*, 949 F.2d at 357.

Defendants argue that probable cause still existed despite this omission, based solely on Ms. McAllister's statements to the Officers, as Ms. McAllister was still "likely to be found" at the 1050 Sherman Street apartment.  However, as explained above, even if Officer Kellogg misunderstood where Mr. McAllister lived initially, by the time he applied for the warrant, he knew that the apartment at 1050 Sherman Street was, in fact, Mr. McAllister's apartment.  He also knew that Ms. McAllister stated that "she would not have left her son there" had she known Mr. McAllister was returning from jail. It was not reasonable for Officer Kellogg, then, to conclude that that the apartment was a place Ms. McAllister was "likely to be found," and no probable cause existed for violating the MPO with respect to Ms. McAllister.  (Doc. # 36-3).

Therefore, although Plaintiff's false arrest claim against Detective Reifsteck and Officer Cash is barred by qualified immunity, his claim against Officer Kellogg is not.  As such, the Court must also determine whether Plaintiff has sufficiently alleged a false arrest claim against Officer Kellogg.  To sustain a claim for false arrest, a Plaintiff must establish that (1) Officer Kellogg intended to restrict Plaintiff's freedom of movement; (2) Plaintiff's freedom of movement was restricted for a period of time, however short, either directly **or indirectly** by an act Officer Kellogg; and (3) Plaintiff was aware that his

freedom of movement was restricted.  *See Goodboe v. Gabriella*, 663 P.2d 1051, 1055-56 (Colo. App. 1983).

Defendants do not challenge that Plaintiff has met the first or third elements stated above, but argue that his claim fails with respect to the second element because Plaintiff failed to specifically allege that (1) Detective Kellogg directly participated in his arrest or (2) that Kellogg's Warrant Affidavit contained any "knowingly false" statements. However, it is clear that such allegations are not required.  First, for liability to attach under Section 1983, direct participation in an arrest is not necessary – and Plaintiff has shown, as explained above, that Officer Kellogg's conduct was a cause of Plaintiff's arrest, because he prepared Warrant Affidavit.  *See Buck v. City of Albuquerque*, 549 F.3d 1269, 1280 (10th Cir. 2008) ("The requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights.")   Plaintiff also alleged that Kellogg's Warrant Affidavit omitted information which would have negated probable cause, even if that information was not "knowingly false." *See DeLoach*, 922 F.2d at 622-23.  As such, Plaintiff has successfully stated a claim for false arrest against Officer Kellogg.

## C.  Plaintiff's Municipal Liability Claim Against Denver

A municipality may not be held liable under Section 1983 solely because its employees inflicted injury on the plaintiff.  *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 694 (1978).  Rather, plaintiffs must prove that "action pursuant to official municipal policy" caused their injury.   *Id.* at 691.  Thus, to establish municipal

liability, a plaintiff must (1) identify a policy or custom that caused the injury, and (2)

establish that there is a direct causal link between the policy or custom and the injury

alleged. *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir. 1993) (citing *City

of Canton v. Harris*, 489 U.S. 378, 385 (1989)).  The Court is well aware of the fact that

discovery is stayed at this juncture and thus that Plaintiff lacks access to specific details

regarding the existence or absence of Denver's internal policies or training procedures.

Nevertheless:

> [A] plaintiff suing a municipality must provide fair notice to the defendant,
> and this requires more than generically restating the elements of municipal
> liability.  Allegations that provide such notice could include, but are not
> limited to, past incidents of misconduct to others, multiple harms that
> occurred to the plaintiff himself, misconduct that occurred in the open, the
> involvement of multiple officials in the misconduct, or the specific topic of
> the challenged policy or training inadequacy.  Those types of details, **or
> any other minimal elaboration a plaintiff can provide**, help to "satisfy
> the requirement of providing not only 'fair notice' of the nature of the claim,
> but also 'grounds' on which the claim rests," *Twombly*, 550 U.S. at 555 n.
> 3, and also to "permit the court to infer more than the mere possibility of
> misconduct." *Iqbal*, 129 S.Ct. at 1950.

*Taylor v. RED Dev., LLC*, No. 11-2178-JWL, 2011 WL 3880881, at *3 (D. Kan. Aug. 31,

2011) (emphasis added) (quoting *Thomas v. City of Galveston, Texas*, 800 F. Supp. 2d

826, 843-44 (S.D. Tex. 2011)).

As for first requirement, a policy or custom may take the form of a "formally

promulgated policy, a well-settled custom or practice, a final decision by a municipal

policymaker, or deliberately indifferent training or supervision."  *Schneider v. City of

Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013).  The "'official policy'

requirement is intended to distinguish acts of the municipality from acts of employees of

the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Id.* at 767.

Here, Plaintiff's *Monell* claim is premised on three alleged policies or practices. First, Plaintiff alleges that Denver had a "custom, practice, and/or policy of not reading or checking the actual contents of court orders such as arrest warrants or protection orders before arresting individuals who are neither wanted nor in violation of protection orders." (Doc. # 33, ¶ 67.)  Second, Plaintiff alleges that, pursuant to this custom or policy, Denver failed to properly train its police so as to avoid arrests without probable cause.  (*Id.*, ¶ 70).   Third, Plaintiff alleges that Denver had a policy or practice of failing to discipline "members of its law enforcement who engage in unconstitutional behaviors, including unlawful arrests made without probable cause."  (*Id.*, ¶ 68).

As for Plaintiff's claim that Denver has a policy or custom whereby its law enforcement personnel fail to read or check the actual contents of protection orders or arrest warrants before making arrests, Plaintiff asserts that his Complaint has sufficiently outlined "the common practice of police officers ignoring facts in seeking and obtaining arrest warrants, including two specific offer [sic] examples of similar conduct." (Doc. # 40 at 14.)   However, in actuality, the Complaint outlined how Detective Reifsteck and Officer Cash not only obtained the initial MPO listing Ms. McAllister as the sole protected party, but also makes clear that they read and paid attention to that document's contents, as they also made notes about Ms. McAllister being the sole protected party in their police reports.  Accordingly, their conduct is in no way probative of such an alleged policy.

As for Officer Kellogg, Plaintiff alleges that his conduct was consistent with a "failure-to-investigate" policy because he ignored or omitted critical information in his Warrant Affidavit indicating that Mr. McAllister's stepdaughter was not, in fact, listed as a protected party in the MPO.  Far from substantiating that any alleged misconduct in this case was a "common practice," however, Plaintiff has not alleged any facts – such as statistics, records of complaints filed with Denver, or even anecdotal evidence – that would indicate that the misconduct alleged in this case was more than an isolated incident.  Additionally, ordinarily, "[p]roof of a single incident of unconstitutional activity is not sufficient to impose [municipal] liability."  *Butler v. City of Norman*, 992 F.2d 1053, 1055 (10th Cir. 1993).  When a plaintiff seeks to impose municipal liability on the basis of a single incident, he must also show the particular illegal course of action was taken pursuant to a decision made by a person with authority to make policy decisions on behalf of the entity being sued.  *Moss v. Kopp*, 559 F.3d 1155, 1169 (10th Cir. 2009); *see also Butler v. City of Norman*, 992 F.2d 1053, 1055 (10th Cir. 1993) (the plaintiff must prove the single incident was "caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker").  In *Moss*, the Tenth Circuit held that the lower court properly dismissed plaintiffs' Section 1983 claim against the sheriff and the county where plaintiffs' only evidence of municipal liability for failure to train was that two deputies "were willing to assist in the illegal actions to deprive [plaintiffs] of their rights."  559 F.3d at 1169.  The court found that plaintiffs "fail[ed] to allege any conduct by [the sheriff or county officials] apart from the conduct" of the individual deputies, and that this was insufficient to state a claim.  *Id.*  In the instant

21

case, Plaintiff has not even named a higher official in his Complaint, and, as in *Moss*,

Plaintiff's only factual basis for Denver's liability is the conduct of Officer Kellogg, an

individual lacking any decision-making authority for Denver.  His claim accordingly fails

as a matter of law.

As for Plaintiff's allegation that Denver failed to train its law enforcement

personnel, Plaintiff must allege facts sufficient to suggest that the failure to train

"amounts to deliberate indifference to the rights of persons with whom the police come

into contact."  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989).  Deliberate

indifference is a "stringent standard of fault," established only "when city policymakers

are on actual or constructive notice that a **particular omission** in their training program

causes city employees to violate citizens' constitutional rights."  *Connick v. Thompson*,

131 S. Ct. 1350, 1359, 1360 (2011) (emphasis added); *see also City of Canton*, 489

U.S. at 390 (A municipality may be liable where "the need for more or different training

is so obvious, and the inadequacy [in training] so likely to result in the violation of

constitutional rights, that the policymakers of the [municipality] can reasonably be said

to have been deliberately indifferent to the need.")    A pattern of similar constitutional

violations by untrained employees is "ordinarily necessary" to demonstrate deliberate

indifference for purposes of failure to train.  *Connick*, 131 S. Ct. at 1360.  Although the

unconstitutional consequences of failing to train can "be so patently obvious that a

[municipality] could be liable under § 1983 without proof of a pre-existing pattern of

violations," such liability is only available in a "rare" case involving a "narrow range of

circumstances." *Id.* at 1361; *see also id.* at 1366 (Scalia, J., concurring) (characterizing

such claims as "rare").

Plaintiff's Complaint, however, alleges no such pattern; rather, the only factual

support he offers for his claim that Denver has an inadequate training program is that

the training program apparently failed with respect to Officer Kellogg, as he allegedly

omitted information in his Warrant Affidavit which led to Plaintiff's arrest.[2]  However, as

the United States Supreme Court explained in *Canton*:

> That a particular officer may be unsatisfactorily trained will not alone
> suffice to fasten liability on the city, for the officer's shortcomings may
> have resulted from factors other than a faulty training program.  It may be,
> for example, that an otherwise sound program has occasionally been
> negligently administered.  Neither will it suffice to prove that an injury or
> accident could have been avoided if an officer had had better or more
> training, sufficient to equip him to avoid the particular injury-causing
> conduct.  Such a claim could be made about almost any encounter
> resulting in injury, yet not condemn the adequacy of the program to enable
> officers to respond properly to the usual and recurring situations with
> which they must deal.  And plainly, adequately trained officers
> occasionally make mistakes; the fact that they do says little about the
> training program or the legal basis for holding the city liable.

109 S.Ct. at 1206.  Plaintiff does not provide any information whatsoever as to how

Denver's training was inadequate, much less factual information indicating that

particular inadequacies **caused** Officer Kellogg's conduct.  Indeed, Plaintiff's own

Complaint outlines how two other law enforcement officials employed by the city (i.e.,

Detective Reifsteck and Officer Cash) properly reviewed the MPO in their initial

---

[2] As explained above, because it is undisputed that Detective Reifsteck and Officer Cash
examined the MPO and specifically reported that the children were not listed as protected
parties, their conduct cannot serve as a factual basis for an allegedly deficient training policy
regarding a failure to investigate protective orders prior to making arrests.

investigation.   "[A]bsent evidence of a program-wide inadequacy in training, any shortfall in a single officer's training can only be classified as negligence on the part of the municipal defendant[.]"  *Blankenhorn v. City of Orange*, 485 F.3d 463, 484–85 (9th Cir. 2007) (citation and internal quotation marks omitted); *see also Moore v. Town of Erie*, 2013 WL 3786646 at *4 (D. Colo. July 19, 2013) (finding that "one prior incident is insufficient to provide the Town of Erie with the actual or constructive notice that it needed to implement a policy or training program").  As such, Plaintiff does not sufficiently plead a failure-to-train claim against Denver.

As for Plaintiff's claim that Denver failed to discipline "members of its law enforcement who engage in unconstitutional behaviors, including unlawful arrests made without probable cause" (Doc. # 33, ¶ 68), the sole example of "unconstitutional behavior" alleged in the Complaint is Mr. McAllister's own arrest. However, Plaintiff must show a "direct causal link between the custom or policy and the violation alleged," *Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006), and Denver's alleged failure to discipline Officer Kellogg for Mr. McAllister's arrest, as a matter of logic, cannot have "caused" Mr. McAllister's arrest.  *See Cordova v. Aragon*, 569 F.3d 1183, 1193 (10th Cir.2009) (noting that, while a failure to discipline might send a message that future violations are tolerated, the basic principles of "linear time prevent us from seeing how conduct that occurs after the alleged violation could have somehow caused that violation.")

Thus, Plaintiff's claim for municipal liability against Denver fails as a matter of law, and will be dismissed with prejudice.[3]

### III.  CONCLUSION

For the foregoing reasons, it is ORDERED that Defendants' Motion to Dismiss (Doc. # 36) is GRANTED in part and DENIED in part.  Specifically, it is ORDERED that Plaintiff's claims against Defendants Reifsteck and Cash are dismissed with prejudice and they are dismissed as parties in this action.  It is further

ORDERED that Plaintiff's second claim against the City of Denver is dismissed with prejudice, and the City of Denver is dismissed as a party in this action.  It is further

ORDERED that Plaintiff's claim against Defendant Kellogg, for false arrest without probable cause, remains.  It is further

ORDERED that the discovery stay imposed at Doc. # 30 is hereby LIFTED.

DATED:  May 14, 2015

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge

---

[3] Although liberal amendment of pleadings is required, Plaintiff has already had the opportunity to amend his Complaint once, and the Court need not provide additional opportunities to amend where prior amendments have failed to produce sufficient allegations to state an actionable Section 1983 claim.  *See Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1365 (10th Cir.1993) (refusing leave to amend may be justified upon "failure to cure deficiencies by amendments previously allowed").  Also, leave to amend may properly be denied where, as here, Plaintiff has not indicated how further amendment would cure the deficiency in his prior pleadings.  *See Hall v. Witteman*, 584 F.3d 859, 868 (10th Cir. 2009).